UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

EUREKA DIVISION

| | |
|---|---|
| ADEEBA SABR,<br><br>    Plaintiff,<br><br>v.<br><br>ANDREW SAUL,<br><br>    Defendant. | Case No. 18-cv-06516-RMI<br><br>**ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 24, 30 |

Plaintiff, Adeeba Mary Sabr, seeks judicial review of an administrative law judge ("ALJ") decision denying her application for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act. Plaintiff's request for review of the ALJ's unfavorable decision was denied by the Appeals Council, thus, the ALJ's decision is the "final decision" of the Commissioner of Social Security which this court may review. *See* 42 U.S.C. §§ 405(g), 1383(c)(3). Both parties have consented to the jurisdiction of a magistrate judge (dkts. 9 & 13), and both parties have moved for summary judgment (dkts. 24 & 30). For the reasons stated below, the court will grant Plaintiff's motion for summary judgment, and will deny Defendant's motion for summary judgment.

## LEGAL STANDARDS

The Commissioner's findings "as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). A district court has a limited scope of review and can only set aside a denial of benefits if it is not supported by substantial evidence or if it is based on legal error. *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995). The phrase "substantial evidence" appears throughout administrative law and direct courts in their review of

factual findings at the agency level. *See Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek*, 139 S. Ct. at 1154 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "In determining whether the Commissioner's findings are supported by substantial evidence," a district court must review the administrative record as a whole, considering "both the evidence that supports and the evidence that detracts from the Commissioner's conclusion." *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998). The Commissioner's conclusion is upheld where evidence is susceptible to more than one rational interpretation. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

## PROCEDURAL HISTORY

On March 4, 2015, Plaintiff filed applications for disability insurance benefits under Title II, and supplemental security income under Title XVI, alleging an onset date of September 8, 2014 as to both applications. *See* Administrative Record ("*AR*") at 15.[1] The ALJ denied the application on December 26, 2017. *Id.* at 29. The Appeals Council denied Plaintiff's request for review on August 29, 2018. *Id.* at 1-4.

## SUMMARY OF THE RELEVANT EVIDENCE

The youngest of six children, Plaintiff is 48 years old and resides in Alameda County, California. *See* Pl.'s Mot. (dkt. 24) at 6; and, *AR* at 763, 1212. Following a series of traumatic events and tragedies, coupled with a history of childhood abuse, Plaintiff was diagnosed by various treating and examining providers as being afflicted with a host of mental impairments including severe anxiety, panic attacks, depression, adjustment disorder, panic disorder, persistent depressive disorder (Dysthemia), chronic posttraumatic stress disorder ("PTSD"), major depressive disorder with recurrent episodes and psychotic features, generalized anxiety disorder, personality disorder with avoidant traits and paranoid and schizoid features, as well as an unspecified neurocognitive disorder. *AR* at 763, 765, 874, 890-91, 1213, 1406.

//

---

[1] The *AR*, which is independently paginated, has been filed in several parts as a number of attachments to Docket Entry #18. *See* (dkts. 18-1 through 18-26).

*The Medical Evidence*

In August of 2015, Plaintiff was referred to Aparna Dixit, Psy.D., for a disability evaluation, from a psychological standpoint, by the California Department of Social Services. *Id.* at 763-65. After briefly noting, in a cursory and generalized fashion, that Plaintiff had a history of trauma and childhood abuse, Dr. Dixit reported that Plaintiff's chief complaints were depression, severe anxiety, and PTSD. *Id.* at 763. Plaintiff told Dr. Dixit that she had not worked since 2013, that she was homeless at the time, and that she was unable to socialize with her friends or family. *Id.* at 764. In the course of this evaluation, Plaintiff was diagnosed with anxiety disorder, not otherwise specified ("NOS"), and depressive disorder NOS. *Id.* at 765. Dr. Dixit opined that because Plaintiff "presented with symptoms of anxiety [] [she] will benefit from counseling and psychiatric treatment for her psychiatric issues." *Id.* Relating to Plaintiff's cognitive functioning – after finding that Plaintiff could remember 3 out of 3 objects immediately and after 3 minutes – Dr. Dixit opined that Plaintiff may have some mild difficulties with remembering and carrying out complex or detailed instructions. *Id.* Likewise, based on their interaction during the examination, Dr. Dixit opined that Plaintiff may have some mild difficulties in dealing with the public. *Id.*

In February of 2016, Plaintiff was referred to Lisa Kalich, Psy.D., for a psychological evaluation geared towards assessing Plaintiff's abilities related to the activities of daily living, social functioning, episodes of decompensation, as well as concentration, persistence, and pace. *Id.* at 870. Dr. Kalich's evaluation consisted of a clinical interview, as well as the administration of two diagnostic tools for the evaluation of depression and trauma symptoms. *Id.* In her report, Dr. Kalich began Plaintiff's social history by noting that she lived with her parents until their divorce when Plaintiff was three years old; thereafter, "her childhood was marked by trauma and disruption." *Id.* When Plaintiff was five years old, her mother, who had struggled with heroin dependence, was incarcerated for five years. *Id.* During those years, between the ages of four and ten, Plaintiff resided in various homes, including with the mother of her father's girlfriend. *Id.* In this home, "she experienced frequent physical abuse . . . [and] was also the victim of sexual abuse by multiple perpetrators, including two of her brothers and her cousin." *Id.* Plaintiff also grew up witnessing frequent bouts of domestic violence between her father and his girlfriends. *Id.* In her

1 teenage years, Plaintiff experienced anxiety to such a degree that it affected her school performance and caused her to be placed in special education, which eventually caused her to drop out of school in the tenth grade. *Id*. at 871. Plaintiff eventually earned her G.E.D., and then attended a junior college for less than two years. *Id*.

Dr. Kalich noted that Plaintiff had been employed for the majority of her adult life, including a number of temporary clerical and receptionist positions, as well as working as an in-home health care worker for many years. *Id*. During this period, anxiety occasionally interfered with her work, particularly when Plaintiff would experience panic attacks at work. *Id*. In 2014, Plaintiff was diagnosed with breast cancer, and "shortly after her diagnosis, her anxiety symptoms intensified." *Id*. She underwent surgery and radiation treatments, which caused the cancer to go into remission. *Id*. However, the anxiety continued to worsen to the point where "she experienced multiple panic attacks on a daily basis." *Id*. at 872. The attacks could last as long as two hours, and they were interspersed generally with "constant worry about having another attack." *Id*. Additionally, "a few times per week, she experiences flashbacks of the sexual abuse," leading to Plaintiff's "current symptoms of depression including low mood, feelings of worthlessness, anhedonia, and sleep an appetite disturbance." *Id*. Dr. Kalich also noted that since 2015, Plaintiff has experienced homelessness, requiring her to sometimes sleep at shelters or in her car, "if a friend's house is unavailable." *Id*. at 871.

As to behavioral observations and Plaintiff's mental status, Dr. Kalich observed that eye contact was varied and that Plaintiff most often either closed her eyes or looked away. *Id*. Plaintiff's mood was observed as depressed and anxious, attended with evidence of psychomotor agitation such as rapidly moving her leg up and down. *Id*. While Plaintiff denied entertaining any such thoughts at the time of the evaluation, she acknowledged having contemplated suicide in the past. *Id*. at 872-73. Upon administering the Trauma Symptom Inventory (2nd ed.) ("TSI-2"), Dr. Kalich noted that Plaintiff's score on the TSI-2 scale was so elevated that "her clinical profile could not be interpreted." *Id*. at 873. Also, following the administering of the Beck Depression Inventory (2nd ed.) ("BDI-II"), Plaintiff's responses indicated symptoms that were consistent with severe depression. *Id*. Dr. Kalich ultimately rendered an assessment of panic disorder, persistent

depressive disorder (Dysthemia), and chronic PTSD, while noting that due to her depression, Plaintiff "likely experiences moderate to intermittently severe impairment with regard to activities of daily living." *Id*. at 874. Regarding her panic disorder and PTSD, Dr. Kalich found that Plaintiff "likely struggles with intermittently severe deficits in concentration and attention." *Id*. at 875. Because of the repetitive nature and frequency of the panic attacks, Dr. Kalich opined that Plaintiff is "unlikely to be able to complete a normal workday without the interference of her symptoms." *Id*.

A few months later, in November of 2016, Plaintiff was referred to Pamela Paradowski, Ph.D., for what was a very limited psychological evaluation geared towards determining her suitability as a candidate for weight-loss surgery. *See id*. at 1212-13. Dr. Paradowski prepared a two-page report that cleared Plaintiff for the surgical procedure and largely focused on detailing Plaintiff's various prior attempts at weight loss including "Weight Watchers, Atkins, fasting, diet pills, the paleo diet, a naturopath, laxatives, low carbohydrate and the cabbage soup diet." *Id*. at 1213. From a psychological standpoint, Dr. Paradowski only noted that "[g]iven the above discussion[,] it is felt that Ms. Sabr's condition most closely approximates . . . Adjustment Disorder NOS." *Id*.

In April of 2017, Plaintiff was referred by her attorney to Katherine Weibe, Ph.D., for a psychological evaluation geared towards determining Plaintiff's state of cognitive and emotional functioning. *Id*. at 878. Initially, Dr. Weibe reviewed the above-described reports prepared by Drs. Kalich and Dixit, and then evaluated Plaintiff through a clinical interview and by administering a battery of diagnostic tests. *Id*. at 881. Delving deeply into Plaintiff's background, Dr. Weibe began by noting that only recently had Plaintiff secured a place to live with assistance from Berkeley Food and Housing, and that she had spent the previous 18-month period suffering from homelessness. *Id*. at 878.

By the time she was four years old, Plaintiff was already accustomed to being "physically abused by her mother who beat her with extension cords, phone records (sic), and lamp cords[,] all with knots in them." *Id*. Due to her mother's heroin dependency, coupled with her father's refusal to take custody, Plaintiff was thereafter raised in various other homes as a foster child. *Id*. Dr.

Weibe then recounted the extent to which Plaintiff's childhood was marked with abuse and trauma in these various homes. *Id*. at 878-79. When she was a young child, Plaintiff first became the victim of sexual abuse by an adult male cousin. *Id*. When she was 10 years old, and had once again become the victim of sexual abuse by one of her brothers, Plaintiff asked her eldest brother for help; but instead of helping, "[h]er oldest brother then started sexually abusing her most severely." *Id*. at 878. Another of Plaintiff's brothers, one who did not subject her to victimization, died after a man poured gasoline on him and set him on fire. *Id*. at 879. Plaintiff was the one to discover his body. *Id*. After her sister and mother both died of cancer, and after her own battle with cancer involving two surgeries and radiation treatment, when Plaintiff found herself unemployed and homeless, she reported that her father ignored her, except to occasionally attempt to recruit her to do "crooked stuff." *Id*.

Based on Plaintiff's clinical interview, as well as her performance on the various diagnostic tests administered, Dr. Weibe made a series of findings as to Plaintiff's abilities regarding language, attention and concentration, executive and memory functioning, and emotional functioning. *Id*. at 881-89. Dr. Weibe found Plaintiff to be mildly impaired in the areas of language, attention and concentration, visual and spatial abilities, as well as sensory and motor abilities. *Id*. at 881-83. Regarding the ability to plan, sequence, abstract, and organize – or, executive functioning – Plaintiff was found to be moderately impaired. *Id*. at 882. Plaintiff's memory functioning, however, was found to be severely impaired given that her immediate and delayed memory were both in the extremely low range (i.e., in the bottom 1st and 2nd percentile of the population). *Id*. at 882. In the domains of emotional functioning, Plaintiff was found to be severely impaired due to severe depression, severe anxiety, and chronic posttraumatic stress "beginning with experiences of sexual, physical, and emotional abuse during her childhood." *Id*. at 883. Dr. Weibe then cataloged Plaintiff's recent symptoms as including "intrusive memories; nightmares; flashbacks; being triggered by reminders; strong physical reactions from reminders; avoiding memories, thoughts, or feelings; avoiding people, places, conversations, activities, objects, or situations; trouble remembering parts of the experience; strong negative beliefs about herself; blaming herself or someone else concerning the experience; strong negative feelings such

as fear, horror, anger, guilt, or shame; loss of interest in activities that she used to enjoy; feeling distant or cut off from other people; trouble experiencing positive feelings; irritable behavior; being hyper-vigilant; feeling jumpy or easily startled; having difficulty concentrating; and having trouble falling and staying asleep." *Id*. at 883-84. Plaintiff's symptoms would often cause full-blown panic attacks several times a week, each of which would last for an hour or longer. *Id*. at 884.

Given Plaintiff's performance on the MCMI-IV, which is "an objective test of psychiatric functioning," Dr. Weibe found that "[o]n the basis of the test data, it may be assumed that she has a severe psychological disorder." *Id*. at 886. Specifically, Dr. Weibe diagnosed Plaintiff as suffering from a major depressive disorder with recurrent episodes and psychotic features; chronic PTSD; generalized anxiety disorder; a personality disorder with avoidant traits and paranoid and schizoid features; as well as with an unspecified neurocognitive disorder that needed to be diagnosed by a medical doctor. *Id*. at 890-91. Dr. Weibe then rendered three conclusions. First, that Plaintiff "evinces cognitive functioning deficits as well as psychiatric disorder problems that make it difficult for her to attend to, remember[,] and follow through with directions and tasks." *Id*. at 890. Second, that Plaintiff's psychiatric problems affect her cognitive abilities causing difficulties in relating effectively with others on a consistent basis. *Id*. Finally, Dr. Weibe concluded that the combination of Plaintiff's psychiatric, cognitive, and personality functioning impairments "would make it difficult for her to function effectively and reliably in a full-time job for likely two years." *Id*.

The following month, in May of 2017, Plaintiff began psychiatric treatment with Summer Savon, M.D., Ph.D.; and, following an initial evaluation and a number of therapy sessions, Dr. Savon submitted a letter summarizing her diagnostic impressions and opinions. *Id*. at 1406. Dr. Savon diagnosed Plaintiff with major depressive disorder, anxiety disorder, history of panic disorder, and PTSD. *Id*. After reviewing the reports of evaluations done by Dr. Kalich and Dr. Weibe, Dr. Savon noted that in addition to impairments in memory, executive and emotional functioning, Plaintiff also "struggles with psychotic symptoms which are incompatible with successful employment." *Id*. Lastly, Dr. Savon opined that Plaintiff "requires a period of removal

7

from the work force in order to address her psychological issues through psychotherapy as well as to optimize her psychotropic medications . . . [and that] [o]nly in this way will she be able to develop the equanimity, psychological health and freedom from disturbances in her inner life that will make it possible for her to be successful in the workplace." *Id*.

Lastly, during this same period, Plaintiff underwent weekly therapy sessions for the better part of a year with Kristen Crowley, LMFT, at the Mind to Mindful Psychotherapy Clinic. *Id*. at 1401-04. Following more than forty 1-hour weekly therapy sessions between 2016 and 2017, Therapist Crowley opined that Plaintiff had marked limitations in dealing with normal work stress, and that Plaintiff had extreme limitations ("no useful ability to perform") in the following areas: maintaining attention for two hour periods; maintaining regular attendance at work; completing a normal workday without interruptions from psychologically based symptoms; and, performing at a consistent pace without an unreasonable number or duration of rest periods. *Id*. at 1403. Further, Ms. Crowley opined that Plaintiff's impairments would interfere with her workplace concentration or pace 40% of the time, and that Plaintiff's symptoms could be expected to cause her to be absent from work more than four days per month. *Id*. at 1404.

## THE FIVE STEP SEQUENTIAL ANALYSIS FOR DETERMINING DISABILITY

A person filing a claim for social security disability benefits ("the claimant") must show that she has the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment" which has lasted or is expected to last for twelve or more months. *See* 20 C.F.R. §§ 416.920(a)(4)(ii), 416.909.[2] The ALJ must consider all evidence in the claimant's case record to determine disability (*see id*. § 416.920(a)(3)), and must use a five-step sequential evaluation process to determine whether the claimant is disabled (*see id*. § 416.920). "[T]he ALJ has a special duty to fully and fairly develop the record and to assure that the claimant's interests are considered." *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 1983).

Here, the ALJ evaluated Plaintiff's application for benefits under the required five-step

---

[2] The regulations for supplemental security income (Title XVI) and disability insurance benefits (Title II) are virtually identical though found in different sections of the CFR. For the sake of convenience, the court will generally cite to the SSI regulations herein unless noted otherwise.

8

sequential evaluation. *AR* at 16-17. At Step One, the claimant bears the burden of showing she has not been engaged in "substantial gainful activity" since the alleged date the claimant became disabled. *See* 20 C.F.R. § 416.920(b). If the claimant has worked and the work is found to be substantial gainful activity, the claimant will be found not disabled. *See id*. The ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date. *AR* at 18. At Step Two, the claimant bears the burden of showing that she has a medically severe impairment or combination of impairments. *See* 20 C.F.R. § 416.920(a)(4)(ii), (c). "An impairment is not severe if it is merely 'a slight abnormality (or combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities.'" *Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005) (quoting S.S.R. No. 96–3(p) (1996)). The ALJ found that Plaintiff suffered from the following severe impairments: PTSD, major depressive disorder, anxiety, obesity, breast cancer in remission. *AR* at 18. Additionally, the ALJ found that Plaintiff's back disorder, atrial fibrillation, knee pain, and dyslexia were not severe impairments, while finding that Plaintiff's bilateral carpel tunnel syndrome was not medically determined. *Id*. at 18-19.

At Step Three, the ALJ compares the claimant's impairments to the impairments listed in appendix 1 to subpart P of part 404. *See* 20 C.F.R. § 416.920(a)(4)(iii), (d). The claimant bears the burden of showing her impairments meet or equal an impairment in the listing. *Id*. If the claimant is successful, a disability is presumed and benefits are awarded. *Id*. If the claimant is unsuccessful, the ALJ assesses the claimant's residual functional capacity ("RFC") and proceeds to Step Four. *See id*. § 416.920(a)(4)(iv), (e). Here, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of any of the listed impairments. *AR* at 19-20. Next, the ALJ determined that Plaintiff retained the RFC to perform work at the medium exertional level, but limited to simple, routine, and repetitive tasks, and with only occasional decision-making, changes in the work setting, and interacting with co-workers and the public. *Id*. at 20-27.

At Step Four, the ALJ determined that Plaintiff is not capable of performing her past relevant work as a home attendant or as an office assistant. *Id*. at 27. Lastly, at Step Five, the ALJ concluded that based on the RFC, Plaintiff's age, education, and work experience, that there are

9

jobs that exist in significant numbers in which Plaintiff can still perform, such as hand packer, assembler, and machine feeder. *Id*. at 27-28. Accordingly, the ALJ concluded that Plaintiff had not been under a disability, as defined in the Social Security Act, from September 8, 2014 through the date of the issuance of the ALJ's decision, December 26, 2017. *Id*. at 28-29.

**ISSUESS PRESENTED**

Plaintiff presents several related issues for review. *See* Pl.'s Mot. (dkt. 24) at 5. First, Plaintiff contends that the ALJ erred by incorrectly evaluating and weighing the medical opinion evidence. *Id*. at 8-12. Plaintiff then argues that as a result of the ALJ's errors in evaluating the medical opinion evidence, the ALJ erred in several regards at Step-2, including the ALJ's failure to consider one of Plaintiff's mental impairments at all. *Id*. at 12-13. Plaintiff also argues that the ALJ erred at Step-3 by failing to discuss the effects of Plaintiff's five severe impairments, singularly or in combination, when evaluating their severity for equivalency with a listed impairment. *Id*. at 13-14. Next, Plaintiff contends that the ALJ erred in evaluating her credibility because the ALJ failed to identify which testimony was accepted and which testimony was rejected. *Id*. at 14-15. Based on the argument that the ALJ erred in evaluating the medical opinion evidence, Plaintiff also contends that the RFC finding was not based on substantial evidence, and that the ALJ failed to provide specific reasoning for every aspect of the RFC. *Id*. at 15-16. Lastly, Plaintiff contends that because the hypothetical questions posed to the vocational expert ("VE") were based on an unsupported RFC, rendering much of the VE testimony unreliable, the dependent finding of non-disability was flawed and that this court should remand for payment of benefits or for further proceedings as appropriate. *Id*. at 16-17.

**DISCUSSION**

The ALJ formulated a RFC for medium work that would be limited to simple, routine, and repetitive tasks, and involving occasional decision-making, changes in the work setting, and interacting with co-workers and the public. Working backwards from that point, the ALJ then ventured to justify the RFC by giving "substantial weight to the August 2015 opinion of consultative psychological examiner Dr. Aparna Dixit, which is generally consistent with the claimant's residual functioning capacity." *Id*. at 25. Likewise, "substantial weight" was given to

10

Dr. Paradowski's 2016 opinion that cleared Plaintiff for weight loss surgery because "it suggests a significant capacity for long-term decision making that is at odds with the claimant's allegations." *Id*. The ALJ gave limited weight to Dr. Kalich's opinions because of the notion that it relied too heavily on Plaintiff's reported symptoms and her responses to psychological testing instruments. *Id*. Likewise, the ALJ gave little weight to Dr. Wiebe's 2017 assessment because "her conclusions rely heavily on the claimant's reported symptoms . . . [and because] [s]uch complaints are not reflected elsewhere in the record." *Id*. at 26. Little weight was also given to Dr. Savon's opinion because, "[i]nsofar as Dr. Savon concedes that she is reliant upon [Drs. Wiebe and Kalich] in her assessment, I similarly accord her opinion little weight." *Id*. Lastly, the ALJ gave little weight to Therapist Crowley's assessment because "the record does not include accompanying treatment notes in support of her assessment," and because the assessment is "at odds with" other isolated notations elsewhere in the record that indicate things such as, "improving mood," "apartment hunting," and "depression better." *Id*. at 26. Accordingly, the ALJ concluded that Plaintiff was able to seek work as an assembler, a machine feeder, or hand packer. *Id*. at 28.

Medical opinions are "distinguished by three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). The medical opinion of a claimant's treating provider is given "controlling weight" so long as it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." 20 C.F.R. § 404.1527(c)(2); *see also Revels v. Berryhill*, 874 F.3d 648, 654 (9th Cir. 2017). In cases where a treating doctor's opinion is not controlling, the opinion is weighted according to factors such as the nature and extent of the treatment relationship, as well as the consistency of the opinion with the record. 20 C.F.R. § 404.1527(c)(2)-(6); *Revels*, 874 F.3d at 654.

"To reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008) (alteration in original) (quoting *Bayliss v. Barnhart*,

427 F.3d 1211, 1216 (9th Cir. 2005)). "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence." *Id*. (quoting *Bayliss*, 427 F.3d at 1216); *see also Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998) ("[The] reasons for rejecting a treating doctor's credible opinion on disability are comparable to those required for rejecting a treating doctor's medical opinion."). "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his [or her] interpretation thereof, and making findings." *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (quoting *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986)). Further, "[t]he opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician." *Lester*, 81 F.3d at 831 (9th Cir. 1995); *see also Revels*, 874 F.3d at 654-55. It should also be noted that greater weight is due to the "opinion of a specialist about medical issues related to his or her area of specialty." 20 C.F.R. § 404.1527(c)(5); *see also Revels*, 874 F.3d at 654. Lastly, where a Plaintiff's condition progressively deteriorates, the most recent medical report is the most probative. *See Young v. Heckler*, 803 F.2d 963, 968 (9th Cir. 1986).

In addition to the medical opinions of doctors, an ALJ must also consider the opinions of medical providers who do not fall within the Social Security Administration's definition of "acceptable medical sources." *See* 20 C.F.R. § 404.1527(b), (f); *see also Revels*, 874 F.3d at 655. While those opinions are not automatically entitled to the same degree of deference, an ALJ may give less deference to such "other sources" only if the ALJ gives reasons germane to that witness. *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012); *Revels*, 874 F.3d at 654. The same factors used to evaluate the opinions of medical providers who are acceptable medical sources (e.g., the nature, length, and extent of the treatment relationship, consistency with the record, and the specialization involved) are used to evaluate the opinions of those who fall outside that category. *See* 20 C.F.R. §§ 404.1527(f), 404.1527(c)(2)-(6); *Revels*, 874 F.3d at 654. Indeed, under some circumstances, the opinion of a treating provider who is not an acceptable medical source may be given greater weight than even the opinion of an "acceptable medical source" when that provider

12

"has seen the individual more often than the treating source, has provided better supporting evidence and a better explanation for the opinion, and the opinion is more consistent with the evidence as a whole." 20 C.F.R. § 404.1527(f)(1); *see also Revels*, 874 F.3d at 655.

Here, Defendant's arguments largely echo the ALJ's stated justifications for why the above-described medical evidence was rejected. *See* Def.'s Mot. (dkt. 30) at 16-22. For example, Defendant notes that in August of 2015, a consultative examiner, Dr. Aparna Dixit, observed that Plaintiff's mood was only mildly anxious during the evaluation; that she could read; that she had fair grooming; was able to follow a 3-step command; was able to perform simple tasks; that she might have mild difficulty in dealing with the public, but not so with co-workers and supervisors; and ultimately, that Plaintiff "could cooperate effectively with the public and co-workers on simple, routine tasks." *Id*. at 16-17. Defendant then notes that shortly thereafter, in October of 2015 and February of 2016, two non-examining state agency consultants reviewed Dr. Dixit's report and rendered largely concurring opinions. *Id*. at 12. Defendant also points to Dr. Paradowski's 2016 decision to clear Plaintiff for weight loss surgery, relying on it to argue the point that "Plaintiff was able to make an informed choice regarding surgery and was sufficiently disciplined to follow post-operative procedures." *Id*. at 17.

Defendant then argues that the ALJ properly rejected the opinions of Dr. Kalich and Dr. Wiebe because they "appeared to be based on Plaintiff's own self-reports," and because their opinions were "inconsistent" with notations made elsewhere in the record, generally by treatment providers for physical impairments, and of questionable relevance, such as Plaintiff's ability to attend medical appointments, groom herself, or to obtain simple meals. *Id*. at 19-20; *see also AR* at 25-26. As to Dr. Savon's opinion, Defendant justifies the rejection of the opinion of Plaintiff's treating psychiatrist by rephrasing a particular statement from Dr. Savon's letter to the ALJ. Defendant contends that Dr. Savon's opinion was due to be given no weight because Dr. Savon "admittedly relied on the opinions of Drs. Wiebe and Kalich," which the ALJ had already rejected. *See* Def.'s Mot. (dkt. 30) at 21; *see also AR* at 26 (where the ALJ explains Dr. Savon "concedes" that her opinion was "reliant upon them"). Lastly, Defendant justifies the ALJ's rejection of Therapist Crowley's opinion because "there were not treatment notes or clinical findings from Ms.

13

Crowley that could support the significant limitations she endorsed." *Id*. at 21. The ALJ's stated reason for rejecting Therapist Crowley's opinion was that "the record does not include accompanying treatment notes in support of her assessment." *AR* at 26. However, the record did in fact include more than 60 pages of very detailed treatment notes that pertained to each of the weekly treatment sessions Plaintiff underwent between August of 2016 and January of 2018. *See id*. at 45-109.

The court finds that these explanations and justifications fall short of the above-described standards. Initially, the court will note that this is a case where the record clearly shows a progressively deteriorating state of mental health. Born in 1971, Plaintiff experienced the above-described history of trauma and abuse throughout her childhood. Nevertheless, she managed to function and maintain employment for much of her life. Then, in 2014, after losing her sister and mother to cancer, and after being diagnosed with cancer herself, Plaintiff's mental health symptoms began to intensify. This deterioration continued until she became unable to work, and eventually became homeless for nearly two years beginning in June of 2015. Accordingly, the ALJ erred in relying so heavily on a consultative evaluation from August of 2015 (Dr. Dixit), in order to discount the subsequent opinions of two examining psychologists who performed more thorough evaluations in February of 2016 (Dr. Kalich) and April of 2017 (Dr. Wiebe), as well as the opinions of Plaintiff's treating psychiatrist (Dr. Savon) and longtime therapist (Therapist Crowley), both of whom rendered their opinions in July of 2017, after a course of treatment. *See Young*, 803 F.2d at 968 (in cases of progressively deteriorating conditions, the most recent medical report is the most probative).

Putting aside the deterioration of Plaintiff's condition, and the temporal problems with crediting Dr. Dixit's 2015 opinion over more recent opinions, including those of Plaintiff's treating physician and therapist, the ALJ's stated justifications for how these opinions were weighed, as well as Defendant's arguments in this court, are independently unpersuasive. First, Dr. Dixit did not venture to delve into Plaintiff's history of trauma, and therefore her opinion seems less relevant than those of Dr. Kalich and Dr. Wiebe. Second, neither the ALJ, nor Defendant, have addressed the fact that Dr. Dixit expressly stated that due to Plaintiff's anxiety

14

symptoms, she needed "counseling and psychiatric treatment for her psychiatric issues." *AR* at 765. Thus, Dr. Dixit's functional opinions, rendered from a psychological standpoint, and to the effect that Plaintiff only had mild difficulties in dealing with the public, or that she could perform simple tasks, was in fact an admittedly incomplete assessment due to Dr. Dixit's express caveat that Plaintiff had "psychiatric issues," which needed "psychiatric treatment." Plaintiff then sought and secured psychiatric treatment from Dr. Savon, who opined in 2017 that Plaintiff "struggles with psychotic symptoms which are incompatible with successful employment . . . [and] that Ms. Sabr requires a period of removal from the work force in order to address her psychological issues through psychotherapy as well as to optimize her psychotropic medications." *Id*. at 1406. Thus, it was error to formulate a RFC that was largely based on Dr. Dixit's incomplete psychological opinion as to Plaintiff's functional limitation, especially in light of Dr. Dixit's statement that Plaintiff required psychiatric treatment. The ALJ should have given the greatest weight to Dr. Savon's opinion because of the fact that Dr. Savon was Plaintiff's treating physician, and also because greater weight is due to the "opinion of a specialist about medical issues related to his or her area of specialty." 20 C.F.R. § 404.1527(c)(5); *Revels*, 874 F.3d at 654.

Regarding the ALJ's rejection of the opinions of Dr. Kalich and Dr. Wiebe for the stated reason that they "rely heavily" on Plaintiff's "reported symptoms and responses to self-assessed inventories" (*AR* at 25-26), Defendant argues that those opinions "were inconsistent with the evidence in the record . . . and appeared to be based on Plaintiff's own self-reports." Def.'s Mot. (dkt. 30) at 19. First, Defendant's suggestion that these opinions were inconsistent with other evidence in record is unpersuasive because Defendant generally only points to isolated notations here and there to the effect that Plaintiff had good grooming on one occasion, was cooperative on another occasion, or appeared to have a "normal" mental status during a physical examination. The court finds that there are no such inconsistencies. Second, it was error to for the ALJ to discount the findings, diagnoses, and opinions of Dr. Kalich and Dr. Wiebe because of any notion that they "rely heavily on Claimant's reported symptoms." In addition to gathering a detailed social history for Plaintiff and administering diagnostic tools for the measurement of trauma and depression symptoms, Dr. Kalich also made a series of clinical observations as to Plaintiff's

15

psychomotor agitations and her need to avoid eye contact. Likewise, in addition to records review and a clinical evaluation, Dr. Wiebe administered no less than 11 different diagnostic tests in an effort to "determine her current cognitive and emotional functioning." *See AR* at 878. Thus, the ALJ erred in rejecting these opinions in this fashion, because it is well established that psychiatric or psychological evaluations based on the patient's self-reporting may not be automatically disregarded because these "[d]iagnoses will always depend in part on the patient's self-report, as well as on the clinician's observations of the patient . . . such is the nature of psychiatry." *Buck v. Berryhill*, 869 F.3d 1040, 1049 (9th Cir. 2017).

Additionally, as the ALJ suggested, Defendant now argues that Dr. Savon's opinion was due to be given "little weight" because she "admittedly relied on the opinions from Drs. Wiebe and Kalich," and therefore, "Dr. Savon's opinion merited little weight for the same reasons." *See* Def.'s Mot. (dkt. 30) at 21; *see also AR* at 26. Defendant's argument is based on a flawed and incorrect premise. When Dr. Savon opined that Plaintiff's psychotic symptoms are "incompatible with successful employment," and that Plaintiff requires a period of removal from the workforce such as to optimize her psychotropic medications, these opinions did not rely on the opinions of Drs. Kalich and Wiebe. The record leaves little room to doubt that Dr. Savon's opinions were rendered based on her own relationship with Plaintiff as her treating psychiatrist. In the course of explaining her opinion, Dr. Savon also related that she had relied on the evaluations performed by Drs. Kalich and Wiebe "in order to expand on [her] preliminary view of Ms. Sabr's functioning," which is not the same as saying that Dr. Savon's psychiatric opinion about her own patient was only based on two previous psychological evaluations performed by others. Accordingly, the ALJ erred in giving Dr. Savon's opinions "little weight" due to the incorrect notion that Dr. Savon was merely parroting Drs. Kalich and Wiebe.

Lastly, to reject the opinion of Therapist Crowley, the ALJ was required to give reasons that are germane to that witness. Instead, the ALJ incorrectly stated that "the record does not include treatment notes in support of her assessment . . . [and] the assessment is at odds with contemporaneous treatment records documenting unremarkable mental status . . ." *AR* at 26. However, as noted above, the record contains more than 60 pages of detailed notes documenting

16

Plaintiff's ongoing therapy with Ms. Crowley from August of 2016 until January of 2018. *See id*. at 45-109. As to the "records documenting unremarkable mental status," the ALJ again points to isolated snippets from elsewhere in the record where it would be noted that Plaintiff was "apartment hunting," or that merely state "depression better," or "anxiety decreased." *Id*. at 26. Because these explanations are based on the incorrect statement that the record does not contain Therapist Crowley's treatment notes, or on logical fallacies or non sequiturs (such as the fact that Plaintiff had good grooming or that she may have searched for an apartment), the court finds that the ALJ erred in rejecting Therapist Crowley's opinion while failing to provide reasons that would be germane to that witness.

In the end, the ALJ failed to provide any specific or legitimate reasons for rejecting the opinions of Drs. Kalich, Wiebe, and Savon. Likewise, the ALJ failed to provide any germane reasoning for rejecting Therapist Crowley's opinion. It is not technically necessary for the court to determine whether or not Dr. Savon's 2017 psychiatric opinion was 'contradicted' by Dr. Dixit's 2015 psychological opinion, because the ALJ's explanation for rejecting Dr. Savon's opinion does not even rise to the level of specific and legitimate reasons – let alone clear and convincing reasons. Nevertheless, as discussed above, the record in this case reflects a worsening of Plaintiff's condition between 2015 and 2017, and further, Dr. Dixit's psychological evaluation was rendered with the specific caveat that Plaintiff would need psychiatric treatment for her psychiatric symptoms, which were beyond Dr. Dixit's expertise. Thus, Dr. Savon's 2017 psychiatric opinion is uncontroverted. *See Ferrando v. Comm'r of SSA*, 449 F. App'x 610, 611 (9th Cir. 2011) ("The record demonstrates that the opinions of the examining psychologist relied on by the ALJ and the treating psychiatrist rejected by the ALJ do not conflict because Ferrando's medical records indicate that his mental impairments worsened between the examining psychologist's evaluation in April 2005 and the treating psychiatrist's evaluation in February 2007.").

The above discussed errors led to the formulation of a RFC that was inconsistent with the body of medical evidence pertaining to Plaintiff's mental health, and consequently an erroneous finding at Step 5 that Plaintiff can work as an assembler, a hand packer, or a machine feeder. At the hearing before the ALJ, the VE testified that if Plaintiff were off task 20% of the time due to

her symptoms, "that would preclude all work." *See AR* at 138. In February of 2016, Dr. Kalich assessed Plaintiff as struggling with intermittently severe deficits in concentration, attention, and activities of daily living, and opined that Plaintiff would be unlikely to complete a normal workday without symptoms-based interferences. In April of 2017, Dr. Wiebe opined that the combination of Plaintiff's psychiatric, cognitive, and personality functioning impairments would make it difficult for her to function effectively and reliably in a full-time job for "likely two years." In July of 2017, Plaintiff's treating psychiatrist, Dr. Savon, opined that Plaintiff still struggled with psychotic symptoms that "are incompatible with successful employment," and that Plaintiff needed to be removed from the workforce "in order to address her psychological issues through psychotherapy as well as to optimize her psychotropic medications." Also in July of 2017, and after a lengthy treatment relationship, Therapist Crowley opined that Plaintiff's impairments would interfere with concentration and pace up to 40% of the time during working hours, and that Plaintiff could be expected to be absent from work due to her symptoms for more than 4 days per month. Had this improperly rejected evidence been credited, the ALJ would have been required to find Plaintiff disabled at Step Five based on the VE's testimony. Accordingly, having been improperly rejected, the opinions rendered by Drs. Kalich, Wiebe, and Savon, as well as Therapist Crowley, will be credited as true for the reasons discussed below.

## NATURE OF REMAND

Having found that the ALJ committed error by not finding Plaintiff disabled at Step Five, the court must now decide if remand for further proceedings is appropriate. It is well established that "[i]f additional proceedings can remedy defects in the original administrative proceeding, a social security case should be remanded [for further proceedings]." *Lewin v. Schweiker*, 654 F.2d 631, 635 (9th Cir. 1981). It is equally well established that courts are empowered to affirm, modify, or reverse a decision by the Commissioner, "with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); *see also Garrison v. Colvin*, 759 F.3d 995, 1019 (9th Cir. 2014). Generally, remand with instructions to award benefits has been considered when it is clear from the record that a claimant is entitled to benefits. *Id*.

The credit-as-true doctrine was announced in *Varney v. Sec'y of Health & Human Servs.*,

18

859 F.2d 1396 (9th Cir. 1988) ("*Varney II*"), where it was held that when "there are no outstanding issues that must be resolved before a proper disability determination can be made, and where it is clear from the administrative record that the ALJ would be required to award benefits if the claimant's excess pain testimony were credited, we will not remand solely to allow the ALJ to make specific findings regarding that testimony . . . [instead] we will . . . take that testimony to be established as true." *Id.* at 1401. The doctrine promotes fairness and efficiency, given that remand for further proceedings can unduly delay income for those unable to work and yet entitled to benefits. *Id.* at 1398.

The credit-as-true rule has been held to also apply to medical opinion evidence, in addition to claimant testimony. *Hammock v. Bowen*, 879 F.2d 498, 503 (9th Cir. 1989). The standard for applying the rule to either is embodied in a three-part test, "each part of which must be satisfied in order for a court to remand to an ALJ with instructions to calculate and award benefits: (1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand." *Garrison*, 759 F.3d at 1020.

It should also be noted that "the required analysis centers on what the record evidence shows about the existence or non-existence of a disability." *Strauss v. Comm'r of the Soc. Sec. Admin.*, 635 F.3d 1135, 1138 (9th Cir. 2011). Thus, even though all conditions of the credit-as-true rule might be satisfied, remand for further proceedings would still be appropriate if an evaluation of the record as a whole creates serious doubt that a claimant is, in fact, disabled. *Garrison*, 759 F.3d at 1021. On the other hand, it would be an abuse of discretion for a district court to remand a case for further proceedings where the credit-as-true rule is satisfied and the record affords no reason to believe that the claimant is not, in fact, disabled. *Id.*

The first part of the credit-as-true test requires the court to determine whether the record has been fully developed and if further administrative proceedings would serve any useful purpose. As discussed above, two examining psychologists, as well as Plaintiff's treating

19

psychiatrist, and her therapist, all essentially concurred that Plaintiff does not enjoy the requisite mental and emotional health to be able to function in any capacity in the employment setting for the time being. The record leaves little room, and gives no reason, to doubt these opinions, given that Plaintiff was the frequent victim of assault and abuse during the formative years of her personality, essentially having grown up in a state of trauma, enduring the murder by burning of her brother, the deaths of her loved ones by cancer, and her own battle with cancer while enduring long periods of homelessness. The court, therefore, finds that the record has been fully developed and that further administrative proceedings would serve no useful purpose. The court also finds, as discussed above, that the ALJ has failed to provide legally sufficient reasons for rejecting the work-preclusive opinions of Drs. Kalich, Wiebe, and Savon, as well as Therapist Crowley, and that if this improperly discredited evidence were credited as true, the ALJ would be required to find Plaintiff disabled at Step Five on remand. Lastly, upon evaluation of the record as a whole, the court finds nothing that could give rise to any serious doubt that a Plaintiff is, in fact, disabled. *See Garrison*, 759 F.3d at 1020-21. Accordingly, this matter is remanded to the Commissioner for calculation and award of appropriate benefits.

## CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment (dkt. 24) is **GRANTED**, and Defendant's Motion for Summary Judgment (dkt. 30) is **DENIED**. The ALJ's finding of non-disability is **REVERSED** and this case is **REMANDED** for the calculation and award of appropriate benefits.

**IT IS SO ORDERED.**

Dated: March 16, 2020

ROBERT M. ILLMAN
United States Magistrate Judge